**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

AMERICAN KRATOM ASSOCIATION, a Virginia non-profit corporation,

Plaintiff,

v.

UNITED STATES DRUG ENFORCEMENT ADMINISTRATION; TERRANCE C. COLE, in his official capacity as Administrator; and UNITED STATES DEPARTMENT OF JUSTICE,

Defendants.

Civil Action No. 1:26-cv-02997-AHA

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DECLARATORY JUDGMENT, AND SPEEDY HEARING UNDER RULE 57 AND INCORPORATED MEMORANDUM OF LAW**

**ORAL ARGUMENT REQUESTED**

**EXPEDITED HEARING REQUESTED**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................1

II. THE UNDISPUTED RECORD SHOWS THAT THE TSO TARGETS MANUFACTURED COMPOUNDS, NOT TRADITIONAL BOTANICAL KRATOM. ...........................................................................................................3

A. The TSO's stated grounds distinguish synthetic derivatives from naturally occurring plant alkaloids like pseduoindoxyl. ..............................................3

B. Claim I presents a ripe Article III controversy notwithstanding DOJ's recent enforcement statements...........................................................................4

C. The operative provisions regulate listed chemical substances—not ordinary botanical kratom...........................................................................................5

D. DOJ's contemporaneous statement confirms the TSO's intent. ............................6

E. The TSO's deadlines make the question ripe, concrete, and important now..........7

III. CLAIM I IS PROPER FOR SUMMARY AND DECLARATORY JUDGMENT BECAUSE IT TURNS ON THE ORDER'S TEXT...................................................8

A. Rule 56 and the Declaratory Judgment Act authorize judgment on this record. .........................................................................................................8

B. The TSO's text, structure, and stated grounds require the requested construction.............................................................................................................9

C. A declaratory judgment on Claim I will resolve the controversy without reaching alternative claims. ..........................................................................11

IV. A SPEEDY HEARING UNDER RULE 57 IS WARRANTED BECAUSE THE DISPUTE PRESENTS A PURE LEGAL QUESTION ON A FIXED PUBLIC RECORD. ...........................................................................................................13

A. Claim I presents a pure question of law..............................................................14

B. The controlling record consists of two fixed public documents. ..........................15

C. The TSO's effective period and compliance deadlines create current uncertainty that prompt adjudication will resolve. ..............................................15

D. The proposed schedule is appropriately limited and preserves Defendants' opportunity to respond. .......................................................................................15

V. CONCLUSION..........................................................................................................16

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Laboratories v. Gardner*,
387 U.S. 149 (1967)....................4

*Chevron Corp. v. Donziger*,
800 F. Supp. 2d 484 (S.D.N.Y. 2011)....................12

*Com. of Puerto Rico v. Alexander*,
438 F. Supp. 90 (D.D.C. 1977)....................9, 11

*Crandon v. United States*,
494 U.S. 152 (1990)....................10

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................10

*Harper v. Bessent*,
795 F. Supp. 3d 28 (D.D.C. 2025)....................12, 16

*Hubay v. Mendez*,
500 F. Supp. 3d 438 (W.D. Pa. 2020)....................13

*Juniper Networks, Inc. v. Bahattab*,
No. 1:07-cv-1771, 2009 WL 6781382 (D.D.C. Aug. 14, 2009)....................8

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)....................4

*Missouri Coal. for the Env't v. United States Army Corps* of *Eng'rs*,
369 F. Supp. 3d 151 (D.D.C. 2019)....................8, 9, 11, 12

*New Hampshire Lottery Commission v. Barr*,
386 F. Supp. 3d 132 (D.N.H. 2019), *aff'd in relevant part sub nom. New Hampshire Lottery Commission v. Rosen*, 986 F.3d 38 (1st Cir. 2021)....................13

*State National Bank of Big Spring v. Lew*,
795 F.3d 48 (D.C. Cir. 2015)....................4

*Wilderness Soc'y v. Morton*,
479 F.2d 842 (D.C. Cir. 1973)....................11

*Woodhull Freedom Foundation v. United States*,
948 F.3d 363 (D.C. Cir. 2020)....................5

**Statutes**

18 U.S.C. § 1084 .......... 13

21 U.S.C. § 822 .......... 7

21 U.S.C. § 823 .......... 7

21 U.S.C. § 957 .......... 7

21 U.S.C. § 958 .......... 7

28 U.S.C. §§ 2201–2202 .......... *passim*

28 U.S.C. § 2201(a) .......... 8

**Rules & Regulations**

21 C.F.R. § 1301 .......... 7

21 C.F.R. § 1308.11(h)(89)–(91) .......... 5, 6

21 C.F.R. § 1312 .......... 7

Fed. R. Civ. P. 56 .......... 1, 16

Fed. R. Civ. P. 56(a) .......... 8

Fed. R. Civ. P. 57 .......... *passim*

Fed. R. Civ. P. 65 .......... 15

**Other Authorities**

*DEA to Temporarily Schedule 7-OH and Related Substances to Protect Public Safe*ty, https://www.dea.gov/press-releases/2026/07/01/dea-temporarily-schedule-7-oh-and-related-substances-protect-public (last visited Sept. 1, 2026) .......... 6

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DECLARATORY JUDGMENT, AND SPEEDY HEARING UNDER RULE 57 AND INCORPORATED MEMORANDUM OF LAW

Plaintiff American Kratom Association ("AKA"), pursuant to Federal Rules of Civil Procedure 56 and 57 and 28 U.S.C. §§ 2201–2202, moves for summary and declaratory judgment on Claim I of its Complaint, and respectfully requests that the Court issue a declaratory judgment that the Temporary Scheduling Order, *Schedules of Controlled Substances: Temporary Placement of Mitragynine Pseudoindoxyl, MGM-15, and MGM-16 in Schedule I*, 91 Fed. Reg. 54,948 (Aug. 26, 2026) (Ex. A) (the "TSO"), does not apply to traditional botanical kratom that contains no intentionally synthesized, isolated, enriched, fortified, concentrated, or added mitragynine pseudoindoxyl ("pseudoindoxyl"), but in which testing detects naturally occurring or naturally formed trace pseudoindoxyl ("traditional botanical kratom"). Claim I presents a pure question of law appropriate for resolution on summary judgment. This Motion is supported by the memorandum of law below, the Statement of Material Facts ("SMF"), the Declarations of Mark Reilly, Gwendolyn C. Payton, and Tiffany McCabe, and the Request for Judicial Notice filed concurrently, and the record in this action.

AKA further requests, under Rule 57, that the Court order a speedy hearing of this action. In support of this Motion, AKA shows as follows:

## I. INTRODUCTION

Claim I asks one narrow question: whether the TSO reaches traditional botanical kratom that contains no intentionally synthesized, isolated, enriched, fortified, concentrated, or added pseudoindoxyl, but in which testing detects naturally occurring or naturally formed trace pseudoindoxyl. It does not. The TSO's text, its stated grounds, and DOJ's contemporaneous public explanation all identify manufactured, concentrated compounds—not traditional botanical kratom—as the object of the order.

AKA therefore asks the Court to declare that the TSO does not apply to traditional botanical kratom merely because sensitive testing detects trace pseudoindoxyl, and to order a speedy hearing under Rule 57 on the limited schedule set out in Section IV.

Claim I presents a pure question of law: what the TSO means, and whether it reaches traditional botanical kratom containing only trace pseudoindoxyl. The Court need not address the validity of the TSO unless it first concludes that the order applies to those products. A declaration adopting AKA's construction would resolve the dispute without reaching the alternative APA, ultra vires, or constitutional claims; if the Court adopts a broader construction, those claims can then be addressed on that basis. That sequencing serves judicial economy and avoids any advisory opinion, because the Court would be declaring the legal boundary of an operative order rather than deciding abstract validity questions.

Two fixed public documents constitute the relevant record and are attached to AKA's concurrently filed Request for Judicial Notice ("Payton Decl."): the TSO (Ex. A) and the Department of Justice's August 25, 2026, press release (Ex. B, the "Press Release"). As Section IV.B explains, the Court can determine their legal meaning without discovery, testimony, expert evidence, or an administrative record.

The controversy is ripe and present. The TSO is already in effect, its compliance periods are running, and unauthorized possession of "any quantity" of a listed substance may trigger criminal, civil, and administrative consequences. SMF ¶¶ 1-9 (Declaration of Gwendolyn C. Payton ("Payton Decl."), Ex. A at 54,948, 54,954–55). AKA's constituents must make compliance decisions now about traditional botanical kratom in which sensitive testing may detect trace pseudoindoxyl. Declaration of Mark Reilly ("Reilly Decl.") ¶¶ 3-13. And Americans who rely on traditional botanical kratom products are uncertain whether these products will remain available

to them. SMF ¶ 17 (Declaration of Tiffany McCabe ("McCabe Decl.") ¶¶ 2-13). DOJ's stated intention not to enforce against such products does not remove that uncertainty, because DOJ simultaneously states that its policy "does not create a legal exemption and does not change MGPI's[1] status as a schedule I controlled substance." SMF ¶ 15 (Payton Decl., Ex. B at 2). Section II.B explains why that nonbinding assurance leaves a live pre-enforcement controversy.

## II. THE UNDISPUTED RECORD SHOWS THAT THE TSO TARGETS MANUFACTURED COMPOUNDS, NOT TRADITIONAL BOTANICAL KRATOM.

### A. The TSO's stated grounds distinguish synthetic derivatives from naturally occurring plant alkaloids like pseduoindoxyl.

The TSO schedules "three 7-hydroxymitragynine-related substances (mitragynine pseudoindoxyl, MGM-15, and MGM-16), including their isomers, esters, ethers, salts, and salts of isomers, esters, and ethers," and imposes "the regulatory controls and administrative, civil, and criminal sanctions applicable to schedule I controlled substances" on persons who handle or propose to handle "these three 7-hydroxymitragynine-related substances." SMF ¶ 2 (Payton Decl., Ex. A at 54,948–49). The order thus identifies three chemical substances and their structural variants—not kratom as a plant, botanical material, or class of products.

The TSO then draws the decisive distinction: "Unlike the indole alkaloids mitragynine and 7-hydroxymitragynine, which are naturally occurring in the plant, mitragynine pseudoindoxyl, MGM-15, and MGM-16 are produced through synthetic modifications of purified mitragynine isolates or 7-hydroxymitragynine." SMF ¶ 3 (Payton Decl., Ex. A at 54,950–51). The TSO's own stated premise is therefore a distinction between naturally occurring plant alkaloids and synthetic derivatives made from purified isolates.

[1] The Press Release refers to pseudoindoxyl, MGM-15, and MGM-16 collectively as "MGPI."

Traditional botanical kratom—kratom containing no intentionally manufactured, isolated, enriched, fortified, concentrated, or added pseudoindoxyl, but in which sensitive testing may detect only trace pseudoindoxyl—falls outside that description. The TSO's stated rationale, directed at deliberately manufactured and concentrated products, cannot support extending Schedule I treatment to trace pseudoindoxyl naturally present or formed in ordinary botanical kratom.

**B. Claim I presents a ripe Article III controversy notwithstanding DOJ's recent enforcement statements.**

The Supreme Court and the D.C. Circuit have long permitted regulated parties to obtain pre-enforcement review rather than choose between abandoning lawful conduct and risking serious legal consequences. In *Abbott Laboratories v. Gardner*, the Court held ripe a pre-enforcement challenge to an FDA regulation that presented a purely legal question and had an immediate effect on regulated businesses, emphasizing that the companies should not be required to violate the regulation and risk civil and criminal penalties before obtaining review. 387 U.S. 136, 149–53 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). The D.C. Circuit applied that principle in *State National Bank v. Lew*, explaining that "regulated parties generally need not violate a law in order to challenge the law" and normally need not "bet the farm" to secure review. 795 F.3d 48, 53–54 (D.C. Cir. 2015) (citation omitted).

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), states the same principle in declaratory-judgment terms: a party does not destroy a controversy by conforming its conduct to avoid threatened legal consequences, because the choice between abandoning desired conduct and risking liability is the very dilemma the Declaratory Judgment Act was designed to alleviate. *Id.* at 128–29 ("Our analysis must begin with the recognition that, where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to

be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.") (emphasis in original).

AKA's constituents likewise need not risk Schedule I prosecution for trading in traditional botanical kratom in order to learn what the TSO means.

*Woodhull Freedom Foundation v. United* States is particularly close on the effect of the Government's present position. 948 F.3d 363 (D.C. Cir. 2020). There, DOJ argued in the litigation that the criminal statute did not prohibit the plaintiffs' intended conduct. The D.C. Circuit nevertheless found a live pre-enforcement controversy because DOJ had not disavowed prosecution and "there is nothing that prevents the [Department] from changing its mind." *Id*. at 373–74 (citation omitted). DOJ's August 25 statement is less protective still: it affirmatively says that the enforcement policy creates no legal exemption and leaves pseudoindoxyl's Schedule I status unchanged. SMF ¶ 15 (Payton Decl., Ex. B at 1). Thus, even if the parties ultimately agree on the proper construction of the TSO, an actual controversy exists until that construction is given binding legal effect.

The controversy is therefore fit for decision now, and delay imposes immediate hardship. The TSO is final and effective; Claim I presents a legal question that no enforcement proceeding would clarify; and withholding review forces regulated businesses to alter present conduct under threat of Schedule I consequences.

### C. The operative provisions regulate listed chemical substances—not ordinary botanical kratom.

The operative entries place the three named substances in 21 C.F.R. § 1308.11(h)(89)–(91), with Drug Codes 9672, 9673, and 9674. SMF ¶ 4 (Payton Decl., Ex. A at 54,956). The entries describe the compounds by chemical structure and common name; they do not list the botanical

plant, ordinary leaf, or kratom products as a separate controlled substance. The inclusion of isomers, esters, ethers, and salts expands the chemical reach to related molecular forms; it does not expand the order to an unlisted plant or every product in which testing finds a trace.

The handling provisions do not silently transform every product with a trace detection into the controlled substance. The order applies controls to persons who "handle (manufacture, distribute, reverse distribute, import, export, engage in research, conduct instructional activities or chemical analysis with, or possess)" the three substances and states that unauthorized activity "is unlawful, and may subject the person to administrative, civil, and/or criminal sanctions." SMF ¶ 9 (Payton Decl., Ex. A at 54,948, 54,955). Those provisions regulate handling of the listed compounds; they do not create a prohibition on traditional botanical kratom untethered to the order's identified synthetic products. Reading them otherwise would make the order's natural-versus-synthetic distinction meaningless.

**D. DOJ's contemporaneous statement confirms the TSO's intent.**

The Press Release states the operative boundary in direct terms: "This action is directed at deliberately manufactured and concentrated opioid products, not traditional botanical kratom." SMF ¶ 11 (Payton Decl., Ex. B at 2). Its subtitle likewise says, "Action targets manufactured products containing potent opioids chemically related to mitragynine or 7-hydroxymitragynine." *Id.* ¶ 12 (Payton Decl., Ex. B at 2). The statement is not an invitation to rely on discretionary non-enforcement. It is the Government's own description of what the TSO reaches.

The Press Release addresses the precise issue presented here: "scientific and analytical questions remain about whether MGPI may be reported at incidental trace levels in some botanical products as a result of processing, storage or analytical conditions." SMF ¶ 13 (Payton Decl., Ex. B at 2). DOJ then states that it "will exercise enforcement discretion when only incidental trace amounts of MGPI are confirmed in a product otherwise consistent with botanical kratom." *Id.* ¶ 14

(Payton Decl., Ex. B at 2). The Press Release thus recognizes the difference between an incidental analytical finding and *a deliberately manufactured or concentrated product—the same distinction the TSO's stated grounds draw*.[2]

That policy language does not solve the problem; it confirms why a declaration is necessary. DOJ expressly says, "This policy does not create a legal exemption and *does not change MGPI's status as a schedule I controlled substance*." SMF ¶ 15 (Payton Decl., Ex. B at 1) (emphasis added). The Court should therefore declare the legal scope of the TSO itself: traditional botanical kratom with only naturally occurring or naturally formed trace pseudoindoxyl is outside the order, not merely tolerated under a revocable enforcement policy. AKA does not ask the Court to enforce a Press Release; it asks the Court to give the TSO its proper legal meaning.

**E. The TSO's deadlines make the question ripe, concrete, and important now.**

The TSO states that it is "effective August 26, 2026, until August 26, 2028." SMF ¶ 5 (Payton Decl., Ex. A at 54,948). It states that "[a]ny person who handles (possesses, manufactures, distributes, reverse distributes, imports, exports, engages in research, or conducts instructional activities or chemical analysis with) or desires to handle, mitragynine pseudoindoxyl, MGM-15, and MGM-16 must be registered with DEA to conduct such activities, pursuant to 21 U.S.C. 822, 823, 957, and 958, and in accordance with 21 CFR parts 1301 and 1312, as of August 26, 2026." *Id.* ¶ 6 (Payton Decl., Ex. A at 54,954). It gives current registrants 30 calendar days to comply with labeling, packaging, inventory, and recordkeeping requirements and gives certain researchers 90 calendar days to submit an application. *Id.* ¶ 7 (Payton Decl., Ex. A at 54,954–55). It further states

[2] DEA drew a similar distinction between "botanical kratom" and "synthesized products and those containing elevated concentrations" in its announcement of the publication of a Notice of Intent to issue a temporary scheduling order for 7-hydroxymitragynine ("7-OH"), published July 1, 2026. *See DEA to Temporarily Schedule 7-OH and Related Substances to Protect Public Safe*ty, U.S. Drug Enforcement Admin. (July 1, 2026) https://www.dea.gov/press-releases/2026/07/01/dea-temporarily-schedule-7-oh-and-related-substances-protect-public (last visited Sept. 1, 2026).

that possession "of any quantity" in an unauthorized manner "is unlawful" and may lead to prosecution. *Id.* ¶ 8 (Payton Decl., Ex. A at 54,955). The order separately provides that "Any activity involving mitragynine pseudoindoxyl, MGM-15, or MGM-16 not authorized by or in violation of the CSA, occurring as of August 26, 2026, is unlawful, and may subject the person to administrative, civil, and/or criminal sanctions." *Id.* ¶ 9 (Payton Decl., Ex. A at 54,955).

Those provisions impose present, concrete consequences rather than abstract regulatory risk. Registration obligations attached on August 26, 2026; labeling, packaging, inventory, and recordkeeping deadlines run 30 calendar days from that date; and possession of "any quantity" in an unauthorized manner is declared unlawful and subject to criminal sanction. SMF ¶¶ 2-9, 16, and 17 (Payton Decl., Ex. A at 54,948, 54,954–56; Reilly Decl. ¶¶ 3-13; McCabe Decl. ¶¶ 2-13). Under the construction AKA opposes, every person who today possesses, ships, or sells ordinary kratom leaf that a sensitive assay might report at trace levels is already out of compliance and already exposed to prosecution—without any registration pathway that a botanical leaf product could realistically satisfy. The scope of the order therefore cannot await the ordinary course of litigation, because it determines whether lawful commerce must stop now.

## III. CLAIM I IS PROPER FOR SUMMARY AND DECLARATORY JUDGMENT BECAUSE IT TURNS ON THE ORDER'S TEXT.

### A. Rule 56 and the Declaratory Judgment Act authorize judgment on this record.

Summary judgment is warranted where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Claim I presents no disputed fact for a jury or agency to resolve. The controlling materials are the TSO and Press Release; their contents are fixed, public, and before the Court through the concurrently filed Request for Judicial Notice. The Court need not weigh competing testimony, resolve a factual

dispute, or await an administrative record to determine what the order says and what the Government has publicly stated about its reach.

The Declaratory Judgment Act authorizes the Court to "declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201(a). Declaratory relief "is appropriate when it will serve a useful purpose in clarifying the legal relations at issue or afford relief from the controversy giving rise to the proceeding." *Mo. Coal. for the Env't v. U.S. Army Corps of Eng'rs*, 369 F. Supp. 3d 151, 162 (D.D.C. 2019). "[T]here must be well-founded reasons for declining to entertain a declaratory judgment action." *Juniper Networks, Inc. v. Bahattab*, No. 1:07-cv-1771 PLF AK, 2009 WL 6781382, at *6 (D.D.C. Aug. 14, 2009) (citation omitted). This is the archetypal case for a declaratory judgment: it will "clarify[] the legal relations at issue" by determining whether AKA and its members must treat traditional botanical kratom as Schedule I material solely because testing detects trace pseudoindoxyl. *Mo. Coal.*, 369 F. Supp. 3d at 162. It will have immediate legal effect during the TSO's stated term. *Id.*

Rule 57 confirms that the existence of another adequate remedy does not foreclose declaratory relief. Fed. R. Civ. P. 57. As this Court has explained, "[t]he statute providing for declaratory judgments meets a real need and should be liberally construed to accomplish the purpose intended, *i.e.* to afford a speedy and inexpensive method of adjudicating legal disputes without invoking the coercive remedies of the old procedure, and to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." *Commonwealth of Puerto Rico v. Alexander*, 438 F. Supp. 90, 93 n.5 (D.D.C. 1977) (citation omitted).

**B. The TSO's text, structure, and stated grounds require the requested construction.**

As Section II explains, the TSO names three chemical substances and defines them by chemical structure, common name, and related isomers, esters, ethers, and salts; it nowhere

schedules traditional botanical kratom. SMF ¶¶ 2-9, 16, and 17 (Payton Decl., Ex. A at 54,948, 54,954–56). The variants language ensures that related molecular forms are covered; it does not turn the plant or every botanical product into a listed substance. And the order's stated grounds distinguish naturally occurring mitragynine and 7-hydroxymitragynine from the three substances "produced through synthetic modifications of purified mitragynine isolates or 7-hydroxymitragynine." *Id.* ¶ 3 (Payton Decl., Ex. A at 54,950–51). The enforcement provisions must be read against that stated object, not as an unbounded prohibition on a plant product the TSO does not identify; otherwise the order's central natural-versus-synthetic distinction would do no work.

The Government's own explanation resolves any remaining uncertainty. DOJ says the TSO does not target "traditional botanical kratom," identifies incidental trace pseudoindoxyl as an analytical issue, and disclaims only a legal exemption—not the stated scope of the action. SMF ¶ 11(Payton Decl., Ex. B at 2). The requested declaration does not convert DOJ's policy into law; it prevents the Press Release's disclaimer from being misread as an expansion of the TSO to reach the traditional botanical kratom products DOJ says it does not target.

Finally, settled interpretive principles compel the narrower reading. The TSO carries criminal consequences and must be construed by reference to its text and stated grounds; any genuine ambiguity about its reach is resolved against extending criminal liability. *See Crandon v. United States*, 494 U.S. 152, 158 (1990). Due process independently requires that regulated parties be able to determine from the order itself what conduct is forbidden. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). Because the TSO's text and stated grounds do not clearly reach traditional botanical kratom, the

Government cannot supply that clarity after the fact through an enforcement policy that expressly disclaims any change in legal status. SMF ¶ 11(Payton Decl., Ex. B at 1).

Defendants may rely on the TSO's statement that possession of "any quantity" of a listed substance is unlawful. But that provision addresses how much of a listed substance is enough once the TSO applies; it does not answer which materials the TSO applies to in the first place. Traditional botanical kratom containing only trace pseudoindoxyl naturally present or formed in the plant is not among the manufactured and concentrated pseudoindoxyl products the TSO schedules, and the phrase "any quantity" therefore does not bring botanical kratom within the order merely because sensitive testing detects a trace amount. SMF ¶ 8-9 (Payton Decl., Ex. A at 54,955).

Reading "any quantity" to capture incidental trace pseudoindoxyl in ordinary botanical kratom would erase the order's express distinction between naturally occurring plant alkaloids and compounds produced through synthetic modification. It would also convert DOJ's statement that the TSO's target is "not traditional botanical kratom" into a promise of discretionary non-enforcement—precisely what the Press Release says it is not offering. SMF ¶¶ 3 and 11 (Payton Decl., Ex. A at 54,950–51; Ex. B at 2). The broader reading would make both documents internally incoherent.

### C. A declaratory judgment on Claim I will resolve the controversy without reaching alternative claims.

Claim I asks the Court to construe the legal scope of an existing, operative order, not to decide whether the order is valid, whether DEA satisfied the APA, or whether any constitutional question is presented. A narrow declaration is therefore the most economical disposition: if the TSO excludes ordinary botanical kratom, the alternative validity claims need not be reached; if

Defendants contend otherwise, the Court will have resolved the threshold legal issue before any broader inquiry.

That is the use Rule 57 contemplates. A declaration will clarify the parties' legal relations and afford relief from the controversy, rather than merely pronounce upon past conduct. The D.C. Circuit has cautioned that "avoidance of a decision on the merits thwarts to some extent that [Declaratory Judgment] Act's laudable policy of providing speedy adjudication of legal disputes to remove uncertainty and insecurity from legal relationships." *Wilderness Soc'y v. Morton*, 479 F.2d 842, 887 (D.C. Cir. 1973); *see also Mo. Coal.*, 369 F. Supp. 3d at 162 ("a declaratory judgment is appropriate when it will serve a useful purpose in clarifying the legal relations at issue or afford relief from the controversy giving rise to the proceeding"); *Alexander*, 438 F. Supp. At 93 n.5 ("The statute providing for declaratory judgments meets a real need and should be liberally construed to accomplish the purpose intended, i.e. to afford a speedy and inexpensive method of adjudicating legal disputes without invoking the coercive remedies of the old procedure, and to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." (quoting *Beacon Construction Company, Inc. v. Matco Electric Company, Inc.*, 521 F.2d 392, 397 (2d Cir. 1975)).

AKA does not seek an advisory opinion. The TSO is effective, its deadlines are running, and its stated sanctions attach to unauthorized handling. Payton Decl., Ex. A at 54,948, 54,954–55. The declaration will tell regulated parties what the order requires now, during its stated term, while leaving any separate challenge to the TSO's validity for another day.

Nor does the requested declaration ask the Court to rewrite the TSO. It asks the Court to apply the TSO's own terms, read in context, to the product category the Government has expressly distinguished from the manufactured products it sought to schedule. SMF ¶¶ 2-15 (Payton Decl.,

Exs. A–B). The requested relief is narrower than an injunction: it imposes no new conduct and simply states the legal boundary of an existing order.

## IV. A SPEEDY HEARING UNDER RULE 57 IS WARRANTED BECAUSE THE DISPUTE PRESENTS A PURE LEGAL QUESTION ON A FIXED PUBLIC RECORD.

Rule 57 permits the Court to "order a speedy hearing of a declaratory-judgment action." Fed. R. Civ. P. 57. That authority reflects "a strong policy favoring early resolution of declaratory judgment actions." *Chevron Corp. v. Donziger*, 800 F. Supp. 2d 484, 491 (S.D.N.Y. 2011). Three considerations favor expedition: (1) whether the dispute involves questions of law rather than contested facts, (2) whether the existing record permits resolution without additional discovery, and (3) whether prompt adjudication will terminate or materially narrow the controversy. *See Mo. Coal.*, 369 F. Supp. 3d at 162; *Harper v. Bessent*, 795 F. Supp. 3d 28, 42 (D.D.C. 2025) (declaratory relief appropriate when it will "clarify[] the legal relations in issue or terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding") (quoting *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980)), *appeal filed*, No. 25-5268 (D.C. Cir. July 23, 2025), *cert. denied before judgment*, 146 S. Ct. 839 (2025. Each consideration is satisfied here.

*Hubay v. Mendez*, 500 F. Supp. 3d 438, 443 (W.D. Pa. 2020), provides a useful procedural model. There, the court explained that Rule 57 gives courts broad discretion to entertain declaratory claims on an expedited basis and that expedited proceedings are appropriate where the determination is largely one of law and factual issues are not predominant. *Id.* at 443. The court further noted that a declaratory action may be promptly resolved through summary judgment rather than a separate "motion for declaratory judgment." *Id.* at 443 n.2 (citation omitted). Claim I is an even cleaner candidate for that procedure because it presents no disputed facts requiring an evidentiary hearing.

Pre-enforcement criminal cases confirm the appropriateness of deciding such legal uncertainty promptly on summary judgment. In *New Hampshire Lottery Commission v. Barr*, 386 F. Supp. 3d 132, 136, 140–45, 157–60 (D.N.H. 2019), *aff'd in relevant part sub nom. New Hampshire Lottery Commission v. Rosen*, 986 F.3d 38, 49–53, 61–62 (1st Cir. 2021), the state lottery and its vendor filed their complaints and motions for summary judgment the same day, seeking a declaration that the federal Wire Act did not criminalize their existing non-sports lottery operations. DOJ had announced temporary forbearance while it reconsidered the statute's application, yet the courts held the controversy justiciable and resolved the statutory interpretation on summary judgment. The First Circuit emphasized that an actual prosecution is not a prerequisite and that regulated parties need not expose themselves to liability before seeking a declaration of the governing criminal law. 986 F.3d at 49–53.

That posture closely resembles this one. AKA does not seek preliminary equitable relief based on a prediction that DOJ will disregard its present enforcement policy. It seeks a prompt merits determination of a fixed legal question so that regulated parties can know whether their ordinary botanical products are lawful before they make business decisions under a regulation carrying criminal consequences.

**A. Claim I presents a pure question of law.**

Claim I asks what a public regulatory order means—not what happened in a contested transaction. Whether the TSO's operative text reaches traditional botanical kratom containing only naturally occurring or naturally formed trace pseudoindoxyl turns entirely on the TSO's text, its stated grounds, and the Government's contemporaneous public explanation. It requires no resolution of any disputed historical fact, credibility determination, or expert opinion.

**B. The controlling record consists of two fixed public documents.**

The TSO and the Press Release supply the entire record necessary to decide Claim I. SMF ¶¶ 2-15 (Payton Decl., Exs. A–B). The TSO sets out the operative text, stated grounds, effective dates, and controls. The Press Release provides DOJ's contemporaneous statement that the action targets "deliberately manufactured and concentrated opioid products, not traditional botanical kratom," and addresses incidental trace detection. *Id.* ¶¶ 11-13 (Payton Decl., Ex. B at 2). Both documents are fixed and public. The Court can determine their legal meaning without depositions, testimony, expert evidence, an administrative record, or any other factual development. Discovery would add nothing because there are no facts to develop—only legal text to construe.

**C. The TSO's effective period and compliance deadlines create current uncertainty that prompt adjudication will resolve.**

The TSO runs from August 26, 2026, until August 26, 2028, its 30- and 90-day compliance deadlines are already approaching, and it states that unauthorized handling "of any quantity" may be prosecuted. SMF ¶¶ 5-7 (Payton Decl., Ex. A at 54,948, 54,954–55). The resulting legal uncertainty is current, not hypothetical: AKA's members must know whether ordinary botanical kratom may be possessed, distributed, and handled without Schedule I consequences when testing detects only trace pseudoindoxyl. SMF ¶ 16 (Reilly Decl. ¶¶ 3-13). A declaration will answer that question during the TSO's stated term; delay will preserve the very uncertainty the Declaratory Judgment Act exists to resolve.

**D. The proposed schedule is appropriately limited and preserves Defendants' opportunity to respond.**

AKA requests the following schedule on the existing paper record: Defendants' opposition due seven (7) days after service of this Motion; Plaintiff's reply due four (4) days after the opposition is filed. The Court may decide the Motion on the papers or set oral argument under LCvR 7(f) at its convenience. This schedule is appropriately limited for three reasons.

*First*, the schedule matches the scope of the issue and requires no discovery. Claim I addresses one discrete legal question: the legal meaning of a regulatory order in light of its text, stated grounds, and the Government's contemporaneous explanation. The TSO and Press Release are public documents that both parties already possess, so Defendants need not gather additional evidence to address what those documents say and mean. An opposition confined to textual analysis can be prepared within seven days.

*Second*, Rule 57 provides a merits procedure without importing the separate burdens of Rule 65. AKA need not prove irreparable harm, balance the equities, or establish the public-interest factors required for preliminary injunctive relief merely to obtain an expedited determination of a ripe declaratory claim. That distinction matters here because DOJ's stated enforcement discretion reduces the practical need for an injunction while leaving unresolved the legal question whether traditional botanical kratom is itself Schedule I material.

*Third*, the schedule preserves Defendants' opportunity to respond fully. Seven days for an opposition and four days for a reply is consistent with expedited briefing schedules in declaratory actions presenting legal questions on a closed record. *See*, *e.g.*, *Harper*, 795 F. Supp. 3d at 42. The Government may address the TSO's text, structure, and stated grounds; it may contest AKA's construction; and it may oppose expedition. The schedule does not truncate any right; it simply forgoes discovery that the paper record makes unnecessary.

## V. CONCLUSION.

For the foregoing reasons, AKA respectfully requests that the Court: (1) grant summary judgment on Claim I under Rule 56; (2) enter declaratory judgment under 28 U.S.C. §§ 2201–2202 declaring that the TSO does not apply to traditional botanical kratom containing no intentionally synthesized, isolated, enriched, fortified, concentrated, or added pseudoindoxyl, even if testing detects naturally occurring or naturally formed trace pseudoindoxyl; (3) order a speedy hearing

under Rule 57; (4) set Defendants' opposition due seven (7) days after service of this Motion and Plaintiff's reply due four (4) days after the opposition is filed; and (5) grant such other relief as the Court deems just and proper.

Dated: September 2, 2026

By: */s/ Gwendolyn C. Payton*

KILPATRICK TOWNSEND & STOCKTON LLP
Gwendolyn C. Payton (DC Bar No. WA0035)
John Neeleman (*pro hac vice* to be filed)
1420 5th Avenue, Suite 3700
Seattle, WA 98101
Telephone: (206) 467-9600
Facsimile: (206) 623-6793
gpayton@ktslaw.com
jneeleman@ktslaw.com

Eric B. Evans (*pro hac vice* to be filed)
1302 El Camino Real, Suite 175
Menlo Park, CA 94025
Telephone: (650) 326-2400
Facsimile: (650) 326-2422
eevans@ktslaw.com

*Attorneys for Plaintiff*
*American Kratom Association*